CARLTON MACH. TOOL CO. v. NILES–BEMENT–POND CO.

Circuit Court of Appeals, Sixth Circuit.
November 10, 1928.

No. 5029.

William R. Wood, of Cincinnati, Ohio (Edmund P. Wood, of Cincinnati, Ohio, on the brief), for appellant.

Albert F. Nathan, of New York City, and J. K. Schofield, of Hartford, Conn. (Border Bowman, of New York City, on the brief), for appellee.

Before DENISON and MOORMAN, Circuit Judges, and ANDERSON, District Judge.

DENISON, Circuit Judge. ▉ This is a suit for infringement of the patent issued to Niles-Bement-Pond Company, as assignee of Sears, being 1,296,863, of March 11, 1919, covering "Adjusting Mechanism for Drilling Machines." In this class of machine the immediate drilling mechanism is horizontally adjustable upon a relatively massive and heavy arm extending from the central frame or support. This arm must itself be adjustable vertically, and, on account of its weight, it is mechanically raised or retarded as it goes up or down. This is accomplished by means of a vertical screw carried by the frame and engaging with a nut in the arm. Before Sears and in feeding mechanism of this class (boring machines, lathes, etc.), it was common to make the nut revoluble in the advancing member and to drive it suitably while the feed screw continued normally stationary; or, at the preference of the builder, to fix the nut in the arm against rotation and to revolve the feed screw. Each form was common enough, and their general equivalence is clear. The second form had been applied to boring machines and drilling machines by a driven gear upon the upper end of this screw, engaging with an adjacent driving gear, and thus suspending the driving screw and the arm from a selected point in the main frame. As the screw or the nut revolved under a positive drive in making the downward adjustment of the arm, it is apparent that, if the arm met some obstacle, its downward impulse under the drive of the screw might continue until something broke. Hence it had been understood that some sort of a safety device was necessary which would release the connections so that the screw and the nut would revolve together, and the downward progress of the nut with relation to the screw would stop. It is plain that, if the nut cannot descend, and if the rotation of either screw or nut continues, the screw must rise, or tend to do so. Advantage of this principle had been taken by three earlier constructors in three different ways. Dreses permitted his screw shaft, carrying a driven gear as its

head, to rise until the gear slid out of mesh with the adjacent driving gear; thereupon the screw and the nut would revolve together. King had a similar arrangement, but the driven gear, instead of forming the permanently attached head of the vertical screw, was splined thereto so that the shaft of the screw would rise and thus free itself from the nut. The American Company had a driven gear which normally actuated the screw shaft, but the connection between the two was made by friction discs, held in driving contact by a spring, and the stoppage of the descending nut increased the resistance to the revolution of the screw shaft, and thus caused the discs to slip and the nut and screw to revolve together.

For these devices Sears substituted a cone gravity friction clutch. Between the bolt head or nut of the screw shaft and the main frame which carried the suspended weight he interposed two contacting cone surfaces. In his form, the nut was the driving member, and it was contemplated that the weight of the arm resting through this cone clutch upon the frame would normally hold the screw against revolution; but that, when the descending arm met an obstacle, thus releasing the downward pressure, the cone clutch would easily slip as the tendency of the screw to rise took effect, and then the nut and screw would revolve together.

Whether there was any invention in thus substituting a common form of gravity frictional clutch as a safety device for the previously known forms of positive driving clutches in which the rising of the screw temporarily released the driving engagement is not as certain as might be; but we are inclined to think that there were in this association such peculiar advantages from the use of a gravity frictional clutch, and that its use called for such a rearrangement of parts, as to justify finding invention present. The peculiar advantage over Dreses and King was that in them the rise of the shaft must be substantial, and for the whole length of the gear teeth or of the spline, before the disengagement took place. In the meantime, there would be at least a tendency for the downward drive of the nut to continue; also, the automatic return to engagement might not be smooth and sure. The advantage over the American was that there was no spring pressure to overcome before the slippage took place, and that the construction was simplified. These considerations demonstrate that the characteristic feature of Sears' invention was, and that his patent must be construed as

securing only, the substitution of a gravity friction clutch at this point for any form of positive geared or toothed engagement, whereby the clutch would be released as soon as the point of slippage was reached, and without requiring any substantial, or perhaps any perceptible, rise in the screw shaft. Sears evidently planned to have his functional grip so delicate that slippage would occur as soon as the tendency of the nut to revolve the screw should be slightly increased by an obstacle, even if the obstacle was during the upward motion of the arm and tended to move the screw bolt downward and increase the frictional grip. It may be that the device could have been so adjusted as to permit even this action—quite inconsistent with the principle upon which patentability is now urged; and we give Sears the benefit of the doubt on this subject.

This being the invention, it was formulated in the claims in suit, of which claim 6 [1] is sufficiently typical. The novelty of these claims, and their substance when considering the question of infringement, is found in the call for "a frictional device engaging the screw and serving to support it and the parts carried thereby, the said friction device normally holding the screw against rotation but permitting it to turn with the nut when the arm is prevented from moving." If the screw shaft had merely an ordinary nut for a head, and in that way carried itself and the arm suspended from the frame, the shaft head or nut itself would be in a sense a frictional device, because the nut might turn on the supporting frame under sufficient impulse, if the friction caused by the weight were not involved; but, both as a matter of construction of the claims and with reference to the presence of invention, we think the "frictional device" must be something interposed between the mere head of the shaft and the frame, and of form intended and adapted to emphasize and utilize and put under better control the inherent gravity friction. The Carlton devices, shown by their drawings 214 and 216, do not in our judgment contain this frictional device. The thing claimed to be such is a set screw, horizontally adjusted

---

[1] "6. In a drilling machine comprising a vertical column and an arm vertically adjustable thereon, the combination of a vertical screw, a nut engaging the screw and serving to support the arm, power means for turning the nut to raise or lower the arm, and a frictional device engaging the screw and serving to support it and the parts carried thereby, the said friction device normally holding the screw against rotation but permitting it to turn with the nut when the arm is prevented from moving."

against the vertical screw shaft. Its effect would be neither increased nor diminished by the screw shaft's tendency to rise, inasmuch as the element of gravity friction is not present. The devices are only instances of a constant friction, yielding to increased resistance. Form 209 is an infringement. An engagement purely by gravity is accomplished through cone contact surfaces, approximating very closely Sears' specific shape. Forms 210 and 215 infringe. It is true, the interposed frictional device may be called merely a washer; but it so expands the friction surface and so releases efficient contact by the slightest rising tendency in the screw shaft, that we classify it as infringing. Form 211, we think, does not contain the characteristic frictional device. The screw shaft is held against revolving by a positive rachet engagement which requires the shaft to be raised to the height of the rachet teeth before the screw may revolve. Save that the purpose of the detachable engagement, holding the two parts together, is to prevent the revolution of either instead of to compel the revolution of both, form 211 is of the type of Dreses or of King; it is a rigid stop, not a frictional device; and, if Sears in his patent had shown this form 211 as his invention, we do not see that the patent could have been sustained.

Complaint is made because proof of the King, Dreses, and American uses was permitted without notice in the answer, and on the theory that these were not anticipations, but showed the state of the art. Doubtless these defenses run together, and the reasonable effect of the statute requiring 30 days' notice should not be escaped in this way; but such notice is for the purpose of preparing to meet and dispute the alleged earlier use. If, upon a record like the present one, plaintiff had requested, or had seemed to need, time to meet a surprise, the trial court would have permitted time for that purpose; but we do not understand that the fact of these earlier uses is in any way challenged, and we see no prejudice to plaintiff in this respect.

The decree below sustained the charge of infringement against some of these forms which we think should be free therefrom. Accordingly, the case is remanded for the entry of a new decree in accordance with this opinion. The modifications are sufficient, so that appellant should recover the costs of this court. The master should be instructed to ascertain the amount of a reasonable royalty upon the infringing devices, in order that the court may be in a position to adopt that measure, if it should conclude so to do.